HIRAM BENNER, JOSEPH B. BROWNE, AND SALISBURY HALEY, AS-
SIGNEES OF ELEAZER P. HUNT, APPELLANTS, *v.* JOSEPH Y. PORTER.

Whilst Florida was a Territory, Congress established courts there, in which cases appropriate to Federal and State jurisdictions were tried indiscriminately.

Florida was admitted into the Union as a State, on the 3d of March, 1845.

The constitution of the State provided, that all officers, civil and military, then holding their offices under the authority of the United States, should continue to hold them until superseded under the State constitution.

But this article did not continue the existence of courts which had been created, as part of the Territorial government, by Congress.

In 1845, the Legislature of the State passed an act for the transfer from the Territorial to the State courts of all cases except those cognizable by the Federal courts; and, in 1847, Congress provided for the transfer of these to the Federal courts.

Therefore, where the Territorial court took cognizance, in 1846, of a case of libel, it acted without any jurisdiction.

The case of Hunt *v.* Palao, 4 Howard, 589, commented on and explained.

THIS was an appeal from the District Court of the United States for Florida.

It originated in the Superior Court for the Southern District of Florida, in March, 1846, and was transferred to the United States District Court for Florida on the 14th of May, 1847.

On the 24th of March, 1846, Joseph Y. Porter filed a libel in admiralty against the appellants, in the Superior Court for the Southern District of the Territory of Florida, for the proceeds of the sloop Texas, charging that he had furnished supplies and stores to the master, at the port of Key West, whilst the vessel was engaged in the business of wrecking.

On the 22d of May, 1846, the Superior Court gave judgment for the libellant, for the sum of $ 1,223.02.

On the 14th of May, 1847, the cause was transferred to the District Court of the United States, and an appeal prayed by the defendants to this court.

Upon this appeal the case came up.

It was argued by *Mr. Westcott* and *Mr. Gilpin,* for the appellants, and by *Mr. Jones,* for the appellee.

The counsel for the appellants made three points, of which it is only necessary to notice the first, as the decision of the court turned upon it.

I. The first reason assigned for a reversal of this decree is that the Territorial court, established and organized in and for the Southern District of Florida, by the act of Congress of 1828, so far as it respects its jurisdiction of cases of Federal character, was abolished by the admission of Florida as a State, on the 3d of March, 1845. Congress could not, under the Constitution, continue such court after Florida became a State. The Federal courts in a State must be established and organized under and in conformity to the Constitution. They must be constitutional courts. The Territorial courts were not established under the provisions of the Federal Constitution relating to the judicial system. The Territorial judges were appointed for four years. The judges of the constitutional Federal courts in the States held their offices during good behaviour. This court has decided the question. (American Insurance Company v. Canter, 1 Peters, 511; Hunt v. Palao, 4 Howard, 589.)

No Territorial statute was in force in 1845, investing any tribunal with admiralty jurisdiction. The act referred to in the case in 1 Peters had long been repealed, and Congress had exercised its right of legislation on that subject. The libel was filed in the court as a Federal court, and under the general law of admiralty. Neither the convention of the people of Florida that formed the State constitution, nor the Legislature of the State, possessed any power to provide for the continuance of the Territoral courts, as Federal courts, nor to interfere with cases exclusively of Federal jurisdiction, in any wise. No provision of the State constitution, or of any act of the State Legislature, could in any degree affect such cases, even as to their transfer to the Federal court organized after the State government went into operation. The State Legislature avoided such interference as to the transfer of the papers of "cases of Federal character and jurisdiction." (State Act of July, 1845, §§ 8, 11, 12, 13, and 14; Thompson's Digest, pp. 53, 54, &c.)

The continuance of the Territorial courts as Federal courts, after the Territorial government ceased to exist, was incompatible with the Federal Constitution. Those provisions of the Federal Constitution having reference to the Federal judiciary in the States, then became of force. Even the consent of a State could not justify a departure from the Constitution.

It has elsewhere been contended, that the act of Congress of the 3d of March, 1845, admitting Florida as a State, and the supplementary act of the same day, for the establishment of a Federal District Court (with Circuit jurisdiction) for the whole

State, did not, *ex vi termini*, operate as a repeal of the acts establishing the Territorial courts, and annihilate those Territorial courts, as Federal courts ; but that such abolition of the Territorial courts then in existence was only effected when the constitutional Federal courts in the State were fully organized. This is the true question in this case, and is fairly stated.    We contend that the Territorial courts, as Federal courts, were abolished the moment Florida was admitted as a State.    The State constitution continued them as State courts only.    It borrowed them from the Territorial organization, temporarily, till the permanent State courts should be organized by the Legislature, and the State judges elected, and all the authority of the Territorial judges to act a day after the admission of Florida as a State was derived from the State constitution, and from that alone.

In this case the suit was instituted, and the decree appealed from was made, after the State courts were organized, and after the State Circuit Judge for the Southern District of Florida had been chosen, and the State court there fully organized and in operation.    The jurisdiction exercised by the Territorial judge was as a Federal court, in a case of exclusive Federal jurisdiction and character, and upon the ground that the Territorial court, as a Federal court, was not abolished until the term of four years, for which the judge had been appointed, had expired, or until he was superseded by the appointment of another Federal judge, to whom the jurisdiction of the Territorial court, of a Federal character, had been legally assigned by act of Congress.    A law officer of the United States, in 1845, wrote an elaborate opinion in favor of the right of the Territorial judges to continue to try and decide cases of Federal character and jurisdiction.    It was published in the newspapers, and is to be found in the Daily Union of the 5th of May, 1845, No. 4, Vol. I., which is in court for the use of the counsel for the appellee, if he desires to use it.    The United States treasury officers continued to pay the salaries of the Territorial judicial officers of Federal appointment, it is believed, till the State Federal courts were organized.    The printed opinion of the former Solicitor of the Treasury, referred to, will be allowed to pass for what it is worth, without any comment, unless the counsel for the appellee urges it as entitled to consideration.    Nor is it deemed necessary to discuss the question whether an illegal payment of salaries of judges by the treasury can revive and continue courts that are by the law of the land defunct, and the existence of which would be inconsistent with the Constitution.    It has been said, the course pursued has been sanctioned by Con-

gress, in the appropriation acts of 1845 and 1846; but it is submitted that the allegation is not sustained by a reference to the acts; and, besides, as before argued, the power of Congress to continue the Territorial courts, as Federal courts, in the State, is denied. But so far from Congress intending to allow or sanction the continuance of these Territorial courts as Federal courts, after the 3d of March, 1845, and so far from its having passed any law confirming the acts of the judges, by the act of the 22d of February, 1847, ch. 17, the question now presented is expressly reserved for the decision of this court. (See section 8 of said act, Pamph. Laws of 1847, p. 24, ch. 17.)

It has been suggested, that, if the arguments just urged are correct, this court will dismiss the appeal in this case without reversing the decree, upon the ground that the proceedings recited in the record were not the acts of a court, were not judicial proceedings, but acts of naked, unwarranted usurpation, utterly null and void, and that no appeal can lie from the decree, as the decree of a judicial tribunal. The suggestion is not deemed to be of very great importance. The decision of this court without a technical reversal of the decree made below, but declaring it to be a nullity for the reason stated, will be all-sufficient for appellants, and we are careless as to the disposition of the case here, consequent on such judgment. Our remedy in such case is plain. If we had paid the money on a void decree, we could recover it back. All parties are liable to us in damages; even the judge may not be exempt, if the case is so decided. But it is conceived that, the decree being rendered under color of judicial authority, and the appeal being taken under the eighth section of the act of Congress of February 22, 1847, ch. 17, before cited, which looks to the decision of this question by this court, and provides the appeal in order that it may be obtained, it is proper that the decree should be formally reversed and set aside, and the case sent back by the mandate of this court to the present United States District Court for the Southern District of Florida, under the same act, in order that the judgment of this court may be entered of record in that court, into which the proceedings and decree appealed from have been transferred under that act.

The record shows that the respondents made objection as to the jurisdiction in the court below; though, if omitted, the decree would not thereby have been legalized.

On the part of the appellee it was contended, —

1. That, upon principles of general law recognized by the common law, and from a civil necessity operating under all

changes of sovereignty and jurisdiction, the tribunals established by Congress in the Territory of Florida continued in existence, and in the practical exercise of their functions, until superseded by other tribunals, called into actual existence and endued with the practical functions of judicature.

2. That this principle applies, *a fortiori*, to the Superior Courts established by Congress in the Territory for the exercise of those functions of judicature which the Constitution has appropriated exclusively to the judicial power of the United States; such as civil cases of admiralty and maritime jurisdiction, and seizures under the revenue laws, &c.

3. That there is nothing in either of the acts of Congress referred to inconsistent with the continued existence of the said Superior Courts in the active exercise of their functions, as instance courts of admiralty, until the District Court for the new District of Florida should be called into being and activity.

4. But, on the contrary, the identical act of Congress (22d Feb., 1847, ch. 17) which called this identical appeal into existence, — the authority asserted for this court, actually assumed by the court, and whereof the court is, at this moment, in the active use and exercise, to review, in the regular course of appellate jurisdiction, the decree of the said Superior Court for the Southern District of Florida, — does necessarily infer the existence of that court, and its continued possession of its judicial functions at the time of the rendition of the decree in question. The still subsisting relation between that court and this, of inferior court and appellate court, being recognized and admitted, to deny the existence of either court, or to assert the utter extinguishment of its judicial capacity, would be equally absurd, whether denied or asserted of the inferior or of the appellate court.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from the District Court of the Southern District of the State of Florida.

Joseph Y. Porter, the appellee, filed a libel in admiralty, on the 24th of March, 1846, against the respondents, in the Superior Court for the Southern District of the Territory of Florida, for the proceeds of the sloop Texas, charging that he had furnished supplies and stores to the master, at the port of Key West, while she was engaged in the business of wrecking upon the Florida coast, and on the high seas.

The respondents, among other grounds of defence, denied the jurisdiction of the court. As the conclusion at which we

have arrived, upon this branch of the defence, disposes of the case, it will be unnecessary to set out the pleadings at large, or to refer more particularly to the facts.

The Territorial government of Florida was established by the act of Congress of March 30th, 1822, amended by the act of March 3d, 1823, and the judicial power vested in two Superior Courts, and such inferior courts and justices of the peace as the Legislative Council of the Territory might from time to time establish.    One of these courts was held in West, and the other in East Florida.    The judges were appointed by the President and Senate, for the term of four years, and possessed civil and criminal jurisdiction within their respective districts ; and also the same jurisdiction in all cases arising under the laws and Constitution of the United States, which the acts of 24th September, 1789, and 7th March, 1793, vested in the court of the Kentucky District.    3 Stat. at Large, 654 ; Ibid. 750.

The number of judges was afterwards increased to five, and original and exclusive cognizance of all cases of admiralty jurisdiction within the Territory in terms conferred upon them. (Act of Cong., May 26, 1824, 4 Stat. at Large, 45 ; Act of Cong., May 15, 1826, Ibid. 164 ; Act of Cong., May 23, 1828, Ibid. 291 ; Act of Cong., July 7, 1838, 5 Stat. at Large, 294 ; Thompson's Dig. 585, App'x, where all the acts of Congress concerning the Territory of Florida are collected.)

Exclusive jurisdiction in these cases was specifically conferred by the act of May 15, 1826, probably on account of the case of The American Insurance Co. and others *v.* Canter, (1 Peters, 511,) in which it was held that the jurisdiction was not, as originally prescribed, exclusive, but might be vested by the Legislative Council of the Territory in subordinate courts. The case arose in 1825.

The court for the Southern District, in which the present case arose and was decided, was established by the act of Congress of May 23d, 1828, at Key West, and had conferred upon it all the jurisdiction within the district which belonged to the other Superior Courts of the Territory ; besides a considerable enlargement of admiralty powers, which became necessary on account of the numerous wrecks usually happening upon that coast.

The objection to the jurisdiction taken by the respondents, however, is, not that the acts of Congress were insufficient to confer the power exercised by the courts, but that the acts had been abrogated and the jurisdiction superseded at the time of the rendition of the decree, by the admission of the Territory of Florida, as a State, into the Union, and were no longer in force.    The admission was on the 3d of March, 1845.

The suit was commenced on March 24th, 1846, and the decree in favor of the libellant pronounced on May 22d of the same year. All the proceedings, therefore, took place before the court after the passage of the act of Congress admitting Florida into the Union; and must be upheld, if upheld at all, upon the ground that the jurisdiction still continued under the Territorial authority, notwithstanding the erection of the Territory into a State.

The people of the Territory, claiming a right to an admission into the Union under the pledge given by the sixth article of the treaty with Spain of the 22d February, 1819, met in convention and adopted their constitution, 11th January, 1839; but it was not acted upon by Congress till March 3, 1845. It was then accepted, and the Territory admitted, in the language of the act, "into the Union on an equal footing with the original States in all respects whatsoever." No conditions were annexed, except that she should not interfere with the disposal of the public lands, nor levy any tax on the same, while they remained the property of the United States.

Her constitution distributed the powers of the government into three separate and distinct departments, executive, legislative, and judicial, and prescribed the organic law of each. The judicial power was vested in a Supreme Court, Courts of Chancery, Circuit Courts, and justices of the peace, and the jurisdiction of each of them either defined, or provided for by imposing the duty upon the General Assembly. The State was to be divided into at least four convenient circuits, and until others were created by the proper authority, were to be arranged as the Western, Middle, Eastern, and Southern Circuits, for each of which a circuit judge was to be appointed. And, in order to avoid any inconvenience or delay in the organization of the government, an ordinance was adopted (art. 17 of the constitution), "that all laws, and parts of laws now (then) in force, or which may hereafter be passed by the Governor and Legislative Council of the Territory of Florida, not repugnant to the provisions of this constitution, shall continue in force until by operation of their provisions or limitation, the same shall cease to be in force, or until the General Assembly of this State shall alter or repeal the same"; and further, that "all officers, civil and military, now holding their offices and appointments in the Territory under the authority of the United States, or under the authority of the Territory, shall continue to hold and exercise their respective offices and appointments, until superseded under this constitution."

It will be seen, therefore, under this ordinance of the con-

vention, that, on the admission of Florida as a State into the Union, the organization of the government under the new constitution became complete; as every department became filled at once by the adoption of the Territorial laws and appointment of the Territorial functionaries for the time being.

The convention being the fountain of all political power, from which flowed that which was embodied in the organic law, were, of course, competent to prescribe the laws and appoint the officers under the constitution, by means whereof the government could be put into immediate operation, and thus avoid an interregnum that must have intervened, if left to an organization according to the provisions of that instrument. This was accomplished by a few lines, adopting the machinery of the Territorial government for the time being, and until superseded by the agency and authority of the constitution itself.

After the unconditional admission of the Territory into the Union as a State, on the 3d of March, 1845, with her constitution, and complete organization of the government under it, by which the authority of the State was established throughout her limits, it is difficult to see upon what ground it can be maintained that any portion of the Territorial government or jurisdiction remained still in force.

The distinction between the Federal and State jurisdictions, under the Constitution of the United States, has no foundation in these Territorial governments; and consequently, no such distinction exists, either in respect to the jurisdiction of their courts or the subjects submitted to their cognizance. They are legislative governments, and their courts legislative courts, Congress, in the exercise of its powers in the organization and government of the Territories, combining the powers of both the Federal and State authorities. There is but one system of government, or of laws operating within their limits, as neither is subject to the constitutional provisions in respect to State and Federal jurisdiction.

They are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control. Whether, or not, there are provisions in that instrument which extend to and act upon these Territorial governments, it is not now material to examine. We are speaking here of those provisions that refer particularly to the distinction between Federal and State jurisdiction.

We think it clear, therefore, that on the unconditional ad-

mission of Florida into the Union as a State, on the 3d of March, 1845, the Territorial government was displaced, abrogated, every part of it; and that no power of jurisdiction existed within her limits, except that derived from the State authority, and that by force and operation of the Federal Constitution and laws of Congress; and, especially, no jurisdiction in Federal cases until Congress interfered and extended the judicial tribunals of the Union over it.

The only pretext for a different conclusion is, that matters of exclusive Federal jurisdiction within the Territory, which, under our system, did not and could not pass under the State authority, still remained; and that with it, to that extent, and for the purposes of Federal jurisdiction, the Territorial organization continued. But, in the view we have already presented, and which need not be repeated, no such distinction existed in the Territorial government. Matters of this description had been blended together with those belonging to State jurisdiction, and were incorporated into, and became part, and parcel of, the same system. The Federal causes of action were subject to the same tribunals as others, and to the same remedies, including writs of error, and appeals to the Appellate Court of the Territory, and through which, alone, cases could be brought up for revision to the Supreme Court of the United States. This Appellate Court consisted of the judges of the Superior Courts of the several judicial districts.

The position taken in support of the jurisdiction assumes that the admission of the State, and consequent transfer of all actions and causes of action belonging to the State authorities, had the effect, not only to separate the Federal from the State subjects of jurisdiction, but also to remodel the judicial system of the Territory itself, and adapt its jurisdiction to the trial of Federal causes, — assumptions that need only to be stated to carry with them their refutation. And, besides, were this admitted, and we could suppose that the jurisdiction of the courts was left untouched, as it respected the Federal cases pending or accruing, nothing would be gained in the argument in favor of its validity.

The admission of the State into the Union brought the Territory under the full and complete operation of the Federal Constitution, and the judicial power of the Union could be exercised only in conformity to the provisions of that instrument. By art. 3, § 1, "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may, from time to time, ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour."

Congress must not only ordain and establish inferior courts within a State, and prescribe their jurisdiction, but the judges appointed to administer them must possess the constitutional tenure of office before they can become invested with any portion of the judicial power of the Union. There is no exception to this rule in the Constitution. The Territorial courts, therefore, were not courts in which the judicial power conferred by the Constitution on the Federal government could be deposited. They were incapable of receiving it, as the tenure of the incumbents was but for four years. (1 Peters, 546.) Neither were they organized by Congress under the Constitution, as they were invested with powers and jurisdiction which that body were incapable of conferring upon a court within the limits of a State.

Another answer, also, to the ground taken, is, that Congress on the same day on which the act passed admitting Florida as a State, organized the State into a judicial district, to be called the District of Florida, and ordained and established a District Court within the same, and conferred upon it the judicial powers belonging to the general government within the State. The act also provided for the appointment of a judge, together with other officers necessary to its complete and efficient organization. The laws of the United States, not locally inapplicable, were, also, extended over the State. Act of Congress, March 3, 1845 (5 Stat. at Large, 788).

It is true, the judge was not appointed to fill the office until the 8th of July, 1846, a year and five months afterwards; but the court was established, and invested with jurisdiction over the Federal cases. The powers remained in abeyance until the office was constitutionally filled. The vesting of the judicial power did not depend upon the appointment of the officer to administer it, as the grant in the constitution to Congress to ordain and establish inferior courts, and to invest them with the judicial power of the Union, is complete in itself; and they had acted and established the court, and invested it with the power, without condition or qualification.

Without, then, pursuing the examination further, we are satisfied that, in any aspect in which the question can be viewed, whether we look at the effect of the act of Congress admitting the Territory of Florida, as a State, into the Union, with her constitution and organized government under it, alone or in connection with the establishment of a Federal court within her limits, her admission immediately, and by constitutional necessity, displaced the Territorial government, and abrogated all its powers and jurisdiction. The State authority was de-

structive of the Territorial; and, in connection with the establishment of the Federal jurisdiction, the organization of the government, State and Federal, under the Constitution of the Union, became complete throughout her limits. No place was left unoccupied for the Territorial organization.

We have chosen to place the decision upon the effect of the admission of the State with a government already organized under her constitution, and prepared to go into immediate operation, because such is the case presented on the record; but we do not thereby intend to imply or admit that a different conclusion would have been reached if it had been otherwise, and the State had come into the Union with nothing but her organic law, leaving the organization of her government under it to a future period.

We conclude, therefore, that the court below possessed no jurisdiction of the case, and that the decree must be reversed.

Neither the act of Congress admitting the Territory of Florida, as a State, into the Union, nor the one organizing the District Court within it, made any provision for the transfer into the District Court of the cases of Federal jurisdiction pending at the time in the Territorial courts. Those cases were, therefore, left in the state in which they stood at the change of government, until the act of Congress of the 22d February, 1847 (Sess. Laws, ch. 17). That act provided for a transfer to the District Court, and also for a review of the judgments and final decrees on writs of error, or appeal, as the case might be, in the proper cases, to this court. It also provided for a review of the judgments or final decrees that had been rendered in Federal cases in the Territorial courts after the change of government, upon the idea that this jurisdiction still continued. And when the District Court for the Southern District of the State of Florida was established by an act of Congress, 23d February, 1847 (Sess. Laws, ch. 20), the like transfer was made to that court of all cases pending in that district, with like power to review, on writ of error or appeal, judgments and final decrees rendered by the Territorial courts after the change of government.

The case now before us was brought up for review by virtue of the authority of these acts, which have removed the objections that existed to our jurisdiction in the case of Hunt v. Palao et al., 4 Howard, 589. Provision was made by the ordinance of the convention of Florida for the transfer of all actions at law, or suits in chancery, pending in the Territorial courts at the time of her admission, into such court of the State as had jurisdiction of the subject-matter. In pursuance of this injunc-

21 *

tion, the General Assembly of the State passed an act, 22d July, 1845, transferring all cases to the proper courts of the State, except cases cognizable by the Federal courts. (Acts of General Assembly, 1 Sess., p. 9, §§ 5, 8, and p. 13, §§ 13, 14.)

The case of Hunt *v.* Palao et al., already referred to, was one that had been transferred by this act of the General Assembly, from the Territorial court in which the judgment had been rendered, to the Supreme Court of the State; and we held, on an application for a writ of error, to review the judgment, that we possessed no power over it without further legislation by Congress, for the reason that the Territorial court in which the judgment was rendered no longer existed; and that the State court to which it had been transferred could exercise no judicial power over it, as the law of the State directing the transfer of the record could not make it a record of the court, nor authorize any proceedings upon it.

The subsequent legislation of Congress respecting the transfer of these records to the District Courts, to which we have referred, grew out of this decision. That was a case of Federal jurisdiction, which the State government, confessedly, had no power over; but the language of the court was general, and applicable to all cases pending in the Territorial courts at the change of government.

We perceive no ground for qualifying the opinion expressed on that occasion, believing it sound and incontrovertible; but it may be proper to state with a little more fulness the effect of it, as it respects cases of State jurisdiction. The Territorial courts were the courts of the general government, and the records in the custody of their clerks the records of that government; and it would seem to follow, necessarily, from these premises, that no one could, legally, take the possession or custody of the same without the assent, express or implied, of Congress. Such assent is essential, upon the plainest principles, to an authorized change of their custody.

On the admission of a Territorial government into the Union as a State, the concurrence of both the Federal and State governments would seem to be required in the transfer of the records, in cases of appropriate State jurisdiction, from the old to the new government. An act of Congress would be incapable of passing them under the State jurisdiction, as would be an act of the Legislature of the State to take the records out of the custody of the Federal government. Both should concur.

The like concurrent legislation would also seem to be required in respect to cases pending in this court for review on writs of error or appeal from the Territorial courts, which ap-

propriately belonged to State jurisdiction, to enable us to send down the mandate to the proper State tribunal for any further proceedings that might be necessary in the cause.    Otherwise, Congress itself should specially provide for the execution of the mandate.

We have said that the assent of Congress was essential to the authorized transfer of the records of the Territorial courts, in suits pending at the time of the change of government, to the custody of State tribunals.    It is proper to add, to avoid misconstruction, that we do not mean thereby to imply or express any opinion on the question, whether or not, without such assent, the State judicatures would acquire jurisdiction. That is altogether a different question.    And, besides, the acts of Congress that have been passed, in several instances, on the admission of a State, providing for the transfers of the Federal causes to the District Court, as in the case of the admission of Florida, already referred to, and saying nothing at the time in respect to those belonging to State authority, may very well imply an assent to the transfer of them by the State to the appropriate tribunal.    Even the omission on the part of Congress to interfere at all in the matter may be subject to a like implication.    And a subsequent assent would, doubtless, operate upon past acts of transfer by the State authority.

It is to be regretted that proper provision has not always been made by Congress, upon a change of government, in respect to the pending business in the Territorial tribunals, so as to remove all embarrassment and perplexity on the subject.

From the examination we have given to the legislation upon the admission of several of the new States into the Union, we have found but few instances of any provision having been made in respect to the cases pending in the old government; and those are limited to the transfer of the Federal cases to the District Court organized in the new State.    In some of the constitutions of the States, provision had been made for the pending business of appropriate State jurisdiction; but not in all of them.    A very slight attention to the subject by Congress, at the time, would remove all the difficulties that have occurred in several of the States recently admitted.

Upon the whole, we are satisfied that the Territorial goverment of Florida became superseded on the unconditional admission of the Territory into the Union as a State, on the 3d of March, 1845, and consequently, that the court below, whose authority depended upon that government, had no jurisdiction to render the decree in the case, and that the decree must be reversed.

A doubt was suggested, on the argument, as to the proper disposition of the case in the event of our arriving at the conclusion, that the jurisdiction of the court below ceased at the termination of the Territorial government. But the acts of Congress of February 22 and 23, 1847 (Sess. Laws, ch. 17, § 8, and ch. 20, § 7), which provided, specially, for a review of this class of cases in this court, have also provided for the execution of any judgment that may be given in them, by directing that the mandate shall be issued to the District Court of the State into which the same acts had already transferred the records.

The case, therefore, can take the usual direction in cases where this court determines that the court below acted without jurisdiction in the matters before it; and that is, to reverse the decree and remit the case, with directions that the court dismiss the proceedings, which direction is given accordingly.

### Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Florida, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, reversed and annulled, for the want of jurisdiction in that court, and that this cause be, and the same is hereby, remanded to the said District Court, with directions to dismiss the libel in this cause.