**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2422
_____

UNITED STATES OF AMERICA

v.

ARACELIS N. AYALA
a/k/a
Gordita
a/k/a
Fluff

Aracelis N. Ayala,
                    Appellant
_____

On Appeal from the District Court of the Virgin Islands
(No. 3:16-cr-00045-001)
District Judge:  Hon. Curtis V. Gomez

Argued:  December 10, 2018

Before:  CHAGARES, HARDIMAN, and RESTREPO,
Circuit Judges.

(Filed March 6, 2019)

Joseph A. Diruzzo, III **[ARGUED]**
DiRuzzo & Company
401 East Las Olas Boulevard
Suite 1400
Fort Lauderdale, FL 33301

Counsel for Appellant

Kim L. Chisholm **[ARGUED]**
Anna A. Vlasova
Office of United States Attorney
5500 Veterans Drive, Suite 260
St. Thomas, VI 00802

Counsel for Appellee

_____

OPINION
_____

CHAGARES, Circuit Judge.

Aracelis N. Ayala was convicted of Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, brandishing a firearm during the commission of a crime of violence, and first degree robbery. She appeals her judgment of conviction on several theories, including that the District Court of the Virgin Islands lacks jurisdiction to hear cases to which the United States is a party, and that judges of the District Court of the Virgin Islands are prohibited from serving beyond their ten-

year statutory terms. She also raises various issues related to her criminal trial and sentencing. For the following reasons, we will affirm.

I.

On August 19, 2015, a jewelry store on St. Thomas, U.S.V.I. was robbed at gunpoint by Turrell Thomas and Jakeem Emmanuel. The store owner and her son were forced to lie face down, their hands and mouths duct taped, while Thomas and Emmanuel stole about one million dollars' worth of jewelry. Raheem Miller waited outside in a car and listened for police on a scanner to ensure that the robbery would not be interrupted. After Thomas and Emmanuel exited the jewelry store with the stolen items, they got in the car, and Miller drove away. Ayala sat in the front passenger seat.

Thomas, Emmanuel, and Miller testified about Ayala's role in the robbery. Ayala paid for their plane tickets from St. Croix to St. Thomas; she reserved and paid for their hotel rooms; and, on the morning of the robbery, she picked up and paid for the rental car. After the robbery, she paid Thomas and Emmanuel for their work.

Based on accomplice liability, Ayala was indicted by a grand jury on five counts: Hobbs Act robbery in violation of 18 U.S.C. § 1951 (Count One); conspiracy to commit Hobbs Act robbery (Count Two); brandishing a firearm during a federal crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); first degree robbery in violation of V.I. Code tit. 14, §§ 1861, 1862(2), and 11 (Count Four); and using an unlicensed firearm during the commission of a

3

robbery in violation of V.I. Code tit. 14, § 2253(a) (Count Five). The Government later dropped Count Five.

At trial, Ayala raised the affirmative defense of duress. She claimed that two men, Bogus a/k/a Bogie ("B") and Waza a/k/a Muwaza ("W"), told her to participate in the robbery, and that she only agreed because she feared for her life. Additionally, she feared for her brother, who was W's cellmate. After a three-day trial, the jury found her guilty on all four counts. The District Court sentenced her to 48 months of imprisonment on Counts One, Two, and Four to run concurrently, and 84 months of imprisonment on Count Three to run consecutively. Ayala timely appealed.

## II.

While Ayala argues the District Court lacked jurisdiction, as we discuss below, the District Court properly exercised jurisdiction pursuant to 18 U.S.C. § 3241. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

Ayala appeals her convictions and sentence on five grounds: (1) the District Court lacked jurisdiction because a court created under Article IV of the U.S. Constitution may not hear a case to which the United States is a party; (2) the presiding judge's service after his ten-year term violates the Appointments Clause and Article III of the U.S. Constitution; (3) her convictions violate the Double Jeopardy Clause of the U.S. Constitution and the Virgin Islands' analogous statutory right, V.I. Code tit. 14, § 104; (4) the District Court erred in

4

limiting her cross-examination; and (5) the District Court erred in permitting her to be shackled at sentencing.

A.

Ayala argues that the District Court of the Virgin Islands lacked jurisdiction to convict her because, as a non-Article III court, it cannot hear cases to which the United States is a party. We exercise plenary review of legal questions. United States v. Perez-Oviedo, 281 F.3d 400, 401 (3d Cir. 2002).

"The District Court of the Virgin Islands derives its jurisdiction from Article IV, § 3 of the United States Constitution, which authorizes Congress to regulate the territories of the United States." United States v. Gillette, 738 F.3d 63, 70 (3d Cir. 2013). Pursuant to Article IV, "Congress establishes the scope of the Virgin Islands District Court's jurisdiction by statute." Id. Congress has provided for such jurisdiction in two ways. First,

> The District Court of the Virgin Islands shall have the jurisdiction of a District Court of the United States, including, but not limited to, the diversity jurisdiction provided for in section 1332 of Title 28 and that of a bankruptcy court of the United States.

48 U.S.C. § 1612(a). And second,

5

> The District Court of the Virgin Islands shall have jurisdiction of offenses under the laws of the United States, not locally inapplicable, committed within the territorial jurisdiction of such courts, and jurisdiction, concurrently with the district courts of the United States, of offenses against the laws of the United States committed upon the high seas.

18 U.S.C. § 3241.

Pursuant to these congressional grants of jurisdiction, we have held that the District Court of the Virgin Islands can adjudicate federal criminal offenses. United States v. Canel, 708 F.2d 894, 896 (3d Cir. 1983). Indeed, "[w]ere we to hold that Title 18 could not be enforced in the District Court of the Virgin Islands, the entire title would be for all intents and purposes a dead letter in the territory." Id. This conclusion follows from the Supreme Court's decision in American Insurance Co. v. Canter, 26 U.S. 511 (1828). There, the Supreme Court observed that territorial courts are "legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." Id. at 546. Similarly, we have noted that "Congress assumed that it had the plenary sovereignty recognized in [Canter]" to pass legislation that creates courts for the

6

territories, and to define the jurisdiction of those territorial courts.  Canel, 708 F.2d at 896.

Ayala's contention — that territorial courts cannot hear cases in which the United States is a party — is a mere re-wording of the argument we rejected in Canel.  The District Court of the Virgin Islands has jurisdiction to hear federal criminal cases, and the United States is a party to every federal criminal case.  Our holding in Canel would be meaningless if territorial courts lacked jurisdiction in cases to which the United States is a party.  Indeed, territorial courts have long heard such cases.  See, e.g., Reynolds v. United States, 98 U.S. 145, 154 (1878) (affirming a conviction entered by the territorial court of Utah for the federal crime of bigamy).

Ayala argues that Glidden Co. v. Zdanok, 370 U.S. 530 (1962), casts doubt on the continued vitality of Canter.  She contends that Justice Harlan's plurality opinion stands for the proposition that Canter is no longer good law because it was premised on practical concerns of governing territories "in a day of poor roads and slow mails."  Id. at 546.  But her attempt to cast doubt on Canter is unavailing, as the quote about practical concerns ignores what the Supreme Court recognized two paragraphs prior:

> All the Chief Justice meant [in Canter], and what the case has ever after been taken to establish, is that in the territories cases and controversies falling within the enumeration of Article III may be heard and decided in courts constituted without regard to the

7

> limitations of that article; courts, that is, having judges of limited tenure and entertaining business beyond the range of conventional cases and controversies.

Id. at 544-45 (footnote omitted). Since at least 1828, it has been the law that Congress may create territorial courts that have jurisdiction to hear cases that Article III courts have jurisdiction to hear. The Supreme Court's teaching in Canter is not limited because the Virgin Islands are now equipped with paved roads, planes, and the Internet. The law remains the same. Article IV, § 3 grants Congress the power to do what it believes proper to regulate the territories, whether that is creating courts with the same jurisdiction as United States District Courts, or not creating courts at all.

We hold that the District Court of the Virgin Islands in this case properly exercised the jurisdiction granted to it by Congress under Article IV of the Constitution.

B.

Ayala argues that her convictions are invalid because the ten-year statutory term of the judge presiding over her trial had expired. The issue therefore is whether a judge serving on the District Court of the Virgin Islands, appointed by the President and confirmed by the Senate, may continue to serve even though the judge's ten-year statutory term has expired. We exercise plenary review of legal questions. Perez-Oviedo, 281 F.3d at 401.

8

1.

Acting pursuant to its Article IV authority, Congress has provided that:

> The President shall, by and with the advice and consent of the Senate, appoint two judges for the District Court of the Virgin Islands, who shall hold office for terms of ten years <u>and until their successors are chosen and qualified</u>, unless sooner removed by the President for cause.

48 U.S.C. § 1614(a) (emphasis added). To interpret the meaning of a statute, we begin with the language itself. See <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989). The language of the statute is plain: a judge may serve for ten years and be replaced at the end of the term; a judge may serve for less than ten years if he is removed for cause; or a judge may serve for more than ten years, until a successor is chosen and qualified.

If Congress wanted the ten-year term to expire after ten years regardless of whether a successor had been appointed and qualified, it would have said so. Congress has done so before. For example, Congress passed a statute providing that "District attorneys shall be appointed for a term of four years and their commissions shall cease and expire at the expiration of four years from their respective dates." <u>Parsons v. United States</u>, 167 U.S. 324, 327-28 (1897) (quoting Rev. Stat. § 769). In reviewing an analogous statute, the Supreme Court observed

9

that "[t]he law intended no more than that these officers should certainly, at the end of that term, be either out of office, or subjected again to the scrutiny of the Senate upon a renomination." Id. at 333 (quoting 5 Op. Atty. Gen. 288, 291 (1851)). A more recent example illustrates the same principle. Congress passed a statute authorizing the appointment of judges to the Tax Courts, provided that the "term of office of any judge of the Tax Court shall expire 15 years after he takes office." 26 U.S.C. § 7443(e).

Here, in contrast, Congress did not explicitly provide that the term will cease and expire after ten years. Congress explicitly provided for the opposite by including the phrase "and until their successors are chosen and qualified." 48 U.S.C. § 1614(a). The clear language of the statute necessitates the conclusion that a judge of the District Court of the Virgin Islands may serve past the expiration of the term, until the President nominates and the Senate confirms a successor.

2.

There is also no constitutional problem with a judge of the District Court of the Virgin Islands serving beyond ten years. Ayala raises two potential constitutional concerns with the statute: the Appointments Clause and Article III.

The Appointments Clause provides:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are

10

not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art II, § 2, cl. 2. "The Constitution, for purposes of appointment . . . divides all its officers into two classes." United States v. Germaine, 99 U.S. 508, 509 (1878). The two classes are principal officers and inferior officers. "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." Buckley v. Valeo, 424 U.S. 1, 132 (1976) (per curiam). While the "line between" the two classes is often "far from clear," Morrison v. Olson, 487 U.S. 654, 671 (1988), it is clear here. Judges of the District Court of the Virgin Islands must be confirmed by the Senate, 48 U.S.C. § 1614(a); therefore, their status as principal officers is unquestionable. Accordingly, judges of the District Court of the Virgin Islands must be nominated by the President and confirmed by the Senate. Their appointment is valid beyond the ten-year term because the President and the Senate explicitly nominated and confirmed them "for terms of ten years and until their successors are chosen and qualified." 48 U.S.C. § 1614(a). The Virgin Islands statute does not run afoul of the Appointments Clause.

Ayala also contends that allowing a judge of the District Court of the Virgin Islands to serve past the expiration of the

11

term effectively robes the judge with "de facto life tenure" in violation of Article III of the U.S. Constitution. Ayala Br. 30. But her argument ignores the fact that a successor may be chosen and qualified at any time. A territorial judge is not transformed into an Article III judge with life tenure by virtue of the fact that he or she may serve beyond the statutory term.

The Supreme Court has long held that while territorial courts can exercise the same jurisdiction as District Courts of the United States, territorial judges are not robed with the privileges of Article III judges. See Benner v. Porter, 50 U.S. 235, 244 (1850) (holding that judges of territorial courts who serve a term of four years cannot receive the "constitutional tenure of office" of Article III judges). Indeed, Article III was "not violated by a statute prescribing for the office of judge of a territorial court a tenure for a fixed term of years, or authorizing his suspension . . . and his ultimate displacement from office, after suspension, by the appointment of some one in his place, by and with the advice and consent of the Senate." McAllister v. United States, 141 U.S. 174, 188 (1891).

In Canel, we held it does not violate due process when a judge of the District Court of the Virgin Islands presides over a criminal trial despite not having life tenure. Canel, 708 F.2d at 897. While Ayala does not allege a due process violation, the underlying logic of Canel stymies her contention. A judge without life tenure may validly preside over federal criminal cases because Congress, acting pursuant to its Article IV authority, has provided for it. Judges of the District Court of the Virgin Islands serving beyond the ten-year term — who may be replaced tomorrow, in five years, or in thirty-five years — are decidedly not judges with life tenure. We therefore hold that judges of the District Court of the Virgin Islands may

12

continue to serve until a successor is chosen and qualified, and such continued service does not violate Article III.

3.

Ayala further argues that the District Court of the Virgin Islands must be established as an Article III court with Article III judges. But she misses the distinction between what Congress may do under the Constitution, and what it should do. It is clear that Congress is authorized to create territorial courts, appoint judges for those courts, and provide or limit the jurisdiction of those courts. Congress may do this, and indeed has passed legislation doing just so. See 18 U.S.C. § 3241; 48 U.S.C. § 1612(a). But whether or not Congress should establish the District Court of the Virgin Islands as one under Article III is not our business. Any argument that the District Court of the Virgin Islands should be established as an Article III court must be addressed to Congress, not to us.

C.

Ayala argues that her convictions for Hobbs Act robbery (Count One) and first degree robbery under Virgin Islands law (Count Four) are multiplicitous and violate both the Double Jeopardy Clause of the Fifth Amendment and section 104 of title 14 of the Virgin Islands Code.[1] Our

---

[1] The Virgin Islands and the United States "are considered one sovereignty for the purposes of determining whether an individual may be punished under both Virgin Islands and United States statutes for a similar offense growing out of the same occurrence." Gov't of the V.I. v. Brathwaite, 782 F.2d 399, 406 (3d Cir. 1986).

13

standard of review is plenary over double jeopardy and multiplicity rulings. United States v. Hodge, 870 F.3d 184, 194 (3d Cir. 2017).

Ayala's Double Jeopardy Clause argument is squarely foreclosed by our precedent. We have held that convictions for both Hobbs Act robbery[2] and Virgin Islands first degree robbery[3] do not violate the Double Jeopardy Clause because "each requires proof of an additional element not required by the other." United States v. Hodge, 211 F.3d 74, 78 (3d Cir.

---

[2] A Hobbs Act robbery occurs when one:

> in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section . . . .

18 U.S.C. § 1951(a).

[3] The Virgin Islands Code defines first degree robbery as: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or immediate flight therefrom, he or another perpetrator of the crime . . . (2) [d]isplays, uses or threatens the use of a dangerous weapon." V.I. Code tit. 14, § 1862(2).

14

2000) (applying test from <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932)).  Specifically, the "federal charge requires that [the defendant's] offense 'affect[ ] commerce' as an element of the crime.  By contrast, the Virgin Islands crime of robbery . . . requires, as an element of the crime, proof that [the defendant] displayed, used or threatened to use a dangerous weapon, and does not implicate [whether it affects commerce] as does the federal offense."  <u>Id.</u>

Second, Ayala contends that section 104 of title 14 of the Virgin Islands Code, which "affords greater protections than the Double Jeopardy Clause," <u>Tyson v. People</u>, 59 V.I. 391, 427 (2013), prohibits multiple punishments under different provisions of the Virgin Islands Code for the same act.  Because the robbery was one act, she claims, her convictions for Hobbs Act robbery and Virgin Islands first degree robbery violate section 104.  Section 104 provides:

> An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

V.I. Code tit. 14, § 104.  The plain language of section 104 — specifically the prepositional phrase "of this Code" — makes clear that it prohibits multiple punishments for one act under different provisions of the <u>Virgin Islands Code</u>.  Ayala was not

15

punished for the act of robbery under multiple provisions of the Virgin Islands Code. She was found guilty of violating and sentenced under only one, V.I. Code tit. 14, § 1862(2).

Accordingly, we hold her convictions are not multiplicitous under section 104, nor do they violate the Double Jeopardy Clause.[4]

### D.

Ayala challenges the District Court's limitation on her ability to cross-examine the Government's witnesses about B's and W's reputations for violence. She contends that this line of questioning should have been allowed because it went to the heart of her affirmative defense of duress: that she only committed the crime because she believed B and W would hurt her or her family if she did not and her fear was objectively reasonable. The District Court excluded this line of questioning on cross-examination under Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

We review a district court's decision regarding the admissibility of evidence for abuse of discretion. United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000). "A district court has broad discretion in conducting [a Rule 403] analysis,

---

[4] In the alternative, she asks us to certify this question to the Virgin Islands Supreme Court. We decline to do so.

16

provided that its reasoning is on the record." United States v. Welshans, 892 F.3d 566, 575 (3d Cir. 2018); see also United States v. Bailey, 840 F.3d 99, 117 (3d Cir. 2016) ("[W]hen reviewing a district court's admission of evidence under Federal Rule of Evidence 403, we do not afford that court the deference normally afforded when we review for abuse of discretion if the district court failed to engage in on-the-record balancing."). "If a district court does not conduct this on-the-record balancing, we either remand the case to the district court or, where practical, undertake this balancing ourselves." Id. at 117-18.

The District Court did not state its reasoning for excluding the evidence under Rule 403, but here it is practical to conduct the balancing ourselves. On cross-examination, Ayala sought to elicit information about B and W from five government witnesses: Detective Sofia Rachid, FBI Agent Christopher Forvour, Emmanuel, Thomas, and Miller. The court allowed Ayala to ask if a witness knew B or W, whether a witness was afraid of them, and how that fear impacted a witness's decisions. Miller and Emmanuel both testified on cross-examination about their fear of B and W. While the court, citing Rule 403, did not allow Miller to answer what B's reputation for violence was, it did permit the following examination:

> Q. But you don't want to say Bogie's name out loud to this jury. You referred to him as a guy instead?
> A. Yes.
> Q. Now why is that? Why wouldn't you want to say Bogie's

17

name and tell this jury about
Bogie?  Why did you try to hide his
identity? . . .
A. Out of fear.
Q. "Out of fear."  Fear of – what are you fearful
of?
A. Of him.

Joint Appendix ("JA") 204.  Emmanuel testified on cross-examination that he turned himself in to the police after the robbery because he "felt threatened big-time" by B and W.  JA 305-06.  The court allowed him to testify that B and W are "both dangerous dudes" and that he was afraid of their "reach" and the violence they could do to his family and him.  JA 307-10.  Thomas, in contrast to Miller and Emmanuel, testified that he was not afraid of B or W.

While we are troubled that the District Court did not provide on-the-record balancing for its Rule 403 rulings, we are satisfied that it did not abuse its discretion by limiting cross-examination.  It is clear from the record that admitting evidence about B's and W's crimes and reputations would pose a danger of confusing the jury.  Ayala's duress defense did not depend on B's and W's past crimes or reputations.  B and W were not on trial, and exploring through testimony how dangerous they were could also have been prejudicial.  Moreover, the evidence's probative value was slight to none.  What Ayala sought to prove — namely, that she faced an immediate threat of death or serious bodily injury; her claimed fear was well-grounded; this immediate threat directly caused her criminal acts; and she did not recklessly place herself in the situation, see Mod. Crim. Jury Instr. 3d Cir. 8.03 (Apr. 2015) (providing instructions for duress defense) — had nothing to

18

do with B's and W's reputations. Therefore, the dangers of confusing and unfairly prejudicing the jury substantially outweighed the reputation testimony's slight (if any) probative value. The District Court's narrow limitation on cross-examination did not hinder Ayala from eliciting the evidence that went to her duress defense. The court allowed the jury to hear whether her co-conspirators were afraid of B and W, and how that fear impacted their participation in the robbery and their actions afterward. Accordingly, we hold the District Court did not abuse its discretion by limiting cross-examination based on Rule 403.

E.

Ayala contends that the District Court's decision to shackle her during her sentencing was an abuse of discretion. We review decisions about shackling for abuse of discretion. See Deck v. Missouri, 544 U.S. 622, 629 (2005).

At her sentencing hearing, Ayala requested her shackles be removed. The District Court denied the request, noting, "I'm advised that there's a security concern, and that is the reason that the United States Marshals Service is undertaking this measure." JA 457. The court expressed willingness to "consider any matters that [the parties] might wish to bring to the court's attention" on this issue. Id. In support of her position, Ayala provided the court with an opinion by the Court of Appeals for the Ninth Circuit, United States v. Sanchez-Gomez, 859 F.3d 649 (9th Cir. 2017) (en banc), vacated as moot, 138 S. Ct. 1532 (2018).

The Supreme Court has held that the visible use of shackles during the penalty phase of a capital proceeding is

19

prohibited, absent a finding of an essential state interest that justifies shackling. Deck, 544 U.S. at 624. The Court in Deck pointed to three principles underlying the "[j]udicial hostility to shackling": (1) shackles undermine the presumption that defendants are innocent until proven guilty, (2) shackles interfere with the right to counsel by making communication with one's attorney more difficult, and (3) shackles challenge the dignity of the judicial process. Id. at 630-31. The Court acknowledged, however, that it does "not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations." Id. at 632.

This Court addressed the issue of shackling during a civil rights trial of claims under 42 U.S.C. § 1983, at which the plaintiff, a prisoner, testified before the jury in visible shackles. Sides v. Cherry, 609 F.3d 576, 579-80 (3d Cir. 2010). We warned that district courts, "[a]t the least . . . should hold a proceeding outside the presence of the jury to address" whether a party should be shackled. Id. at 582. While courts may rely heavily on the Marshals' recommendation, we explained that they cannot hand their discretion entirely to the Marshals. Id. We recognized:

> district courts have the weighty responsibility of ensuring the security of their courtrooms, and endorse their broad discretion in determining whether it is necessary to have a prisoner-party or witness physically restrained during a civil trial. So long as a district court engages in an

20

appropriate inquiry and supplies a reasonable basis for its decision, we will defer to its determination that physical restraints are necessary to ensure courtroom security, as the trial judge is uniquely positioned and qualified to make that determination.

Id. at 585-86.

While Deck and Sides provide the relevant legal principles to decide the issue before us, their factual and legal contexts are sufficiently distinct from Ayala's situation. The Supreme Court in Deck acknowledged that the reasons against shackling a criminal defendant at the guilt phase "apply with like force to penalty proceedings in capital cases" because the jury must "decid[e] between life and death." Deck, 544 U.S. at 632. Ayala, however, did not face the death penalty, nor did a jury sentence her. Moreover, the mandate in Sides for a "proceeding outside the presence of the jury" to determine if shackles are warranted is not applicable here, where the sentencing was conducted by the judge alone. Sides, 609 F.3d at 582. While the District Court acknowledged that it "defer[s]" to the Marshals, in offering to hear arguments and accept briefing, it demonstrated that it did not merely delegate the decision. JA 458-59.

The Courts of Appeals for the Second, Eleventh, and Ninth Circuits have considered this issue. The Court of Appeals for the Second Circuit held that a separate evaluation of the need to restrain a party in court is not required in the "context of non-jury sentencing proceedings" because courts

21

"traditionally assume that judges, unlike juries, are not prejudiced by impermissible factors." United States v. Zuber, 118 F.3d 101, 104 (2d Cir. 1997). More recently, the Court of Appeals for the Eleventh Circuit held that "the rule against shackling does not apply to a sentencing hearing before a district judge." United States v. LaFond, 783 F.3d 1216, 1225 (11th Cir. 2015). The court reasoned, relying on Deck, that the traditional rule against shackling was designed to protect defendants appearing before a jury. Id.

The Court of Appeals for the Ninth Circuit, however, held that a district-wide policy of routinely shackling all pretrial detainees in the courtroom is unconstitutional. Sanchez-Gomez, 859 F.3d at 666. The court held that district courts must make individualized findings that a defendant presents a security threat before he or she is shackled and that this requirement applies at all stages of the criminal process, regardless of jury presence. Id. at 661, 666. But even if the Supreme Court had not vacated this decision as moot, it would not help Ayala. Ayala was not subjected to a blanket policy requiring shackling; instead, the Marshals recommended she be shackled and the District Court agreed.

We are not persuaded that a bright-line rule is necessary to our disposition here. We instead emphasize the importance of the discretion that both Deck and Sides recognized. District courts need "latitude" to make "individualized security determinations," Deck, 544 U.S. at 632, because they are "uniquely positioned and qualified," Sides, 609 F.3d at 586, to determine a defendant's potential security risk (or lack thereof).

We hold the District Court did not abuse its discretion in denying Ayala's request to remove her shackles during her criminal sentencing.

## IV.

For the foregoing reasons, we will affirm Ayala's judgment of conviction and sentence.